## Dixon, Jr. v. McKim

*Eckert, Seamans & Cherin*, for plaintiffs.

*Reed, Smith, Shaw & McClay*, for defendants.

ALPERN, J., August 4, 1967.—This matter is before the chancellor on a complaint in equity filed by 182

former employes of the Controls Division of Hagan Chemicals & Controls, Inc. (now known as Calgon Corporation) against the advisory committee of the Hagan Corporation Profit-Sharing Plan and Trust, and Pittsburgh National Bank, as trustee under the profit sharing plan. Plaintiffs claim they have the right to certain funds that were declared forfeited when their employment with Hagan was terminated. Extensive testimony was taken, and findings of fact, conclusions of law, and briefs were filed by the parties to the litigation.

The employes who instituted the action were participating employes under the profit sharing plan until their employment was terminated on April 30, 1963, by the sale of the Controls Division of Hagan Chemicals & Controls, Inc., to Westinghouse Electric Company. These employes received their share in the profits for every year of participation in the Hagan Plan. They claim an additional right to receive the unvested fund of $157,359.27, which was forfeited and reallocated among the remaining participants in the profit sharing plan in accordance with its terms. The Hagan Company continued to operate as a chemical company, with the same profit sharing plan, after the sale of the controls division.

It is urged by plaintiffs that the sale of a division resulted in a partial termination of the profit sharing plan as to the controls division employes and entitled them to full vesting of their rights under the plan because their severance from the company was not voluntary.

The Hagan Plan is a noncontributory profit sharing plan funded by the corporation's annual contributions from its consolidated net income and the trust net income. Those in the employ of the company at the time of the adoption of the plan became participants immediately. New employes became participants after

five years of continuous service with the company. The plan provides that it may be terminated by the employer at any time, but that no funds in the plan could ever revert to the company. The Hagan Plan is a conventional one, with the usual eligibility, vesting, and forfeiture provisions.

Tentative allocations of profits are made to each participating employe's individual account, subject to the express provision in the plan for full vesting of benefits in 10 years, and partial vesting for each year of participation in the plan. The Hagan Plan provides that the unvested balance of the account of a participant whose employment with the company has been severed, is forfeited and reallocated among the remaining participating employes, except under certain specified conditions.

Members of the Hagan Board of Directors serve as an advisory committee to administer the plan. The plan provides that the advisory committee has complete control of the administration of the Hagan Plan and its construction. It has the express power to decide all questions relating to the eligibility of employes to participate in the benefits of the plan. The company is empowered to make amendments to the plan.

There was testimony that the decision of Hagan Chemicals & Controls, Inc., to sell the assets, business, and corporate name of its Controls Division to Westinghouse Electric Corporation was impelled by its unprofitable operation over a period of time and by the need for substantial research and development investments to meet competition in the controls field. Virtually all of the employes of the controls division became employes of Westinghouse on May 1, 1963, the day after the termination of their employment with Hagan, with higher salaries, stock purchase options, seniority rights, and a superior pension plan. Westinghouse had no profit sharing plans.

In the sale of the controls division and the Hagan name to Westinghouse, it was advantageous to Hagan that practically all of the employes trained in controls accepted employment at Westinghouse. It was beneficial to the employes because it gave them immediate opportunity for uninterrupted employment under highly favorable terms. The controls division employes were not given an opportunity for employment in other departments of the Hagan Company, which was to operate in the future solely as a chemical plant under the name Calgon Corporation.

There were 639 participants in the Hagan Plan when this sale was made. Of these, 257 were employes of the Controls Division. Seventy-five employes in the controls division had more than 10 years' participation. Their rights under the terms of the plan were fully vested and they were paid in full. They are not involved in this litigation.

One hundred eighty-two members of the controls division had less than 10 years' participation in the Hagan Plan. They were not deprived of all profit sharing benefits when their employment was terminated. They were paid in accordance with the partial vesting formula provided in the plan, namely, 10 percent for every year of participation. The payments to the individual employes varied from 10 percent to 90 percent of their respective accounts, depending upon the number of full years of participation. While none of these plaintiffs were paid as much as those with fully vested rights, their total years of participation were recognized in determining the amounts due them. They were paid the sum of $250,508.45 at the time their employment was terminated.

It is these 182 employes who constitute plaintiffs in this action. They claim that they are entitled, in addition, to distribution among them of the $157,359.27 of unvested funds which were reallocated among the re-

maining participants in the Hagan Plan under the forfeiture provision of the plan. It is the position of plaintiffs that the sale of the controls division by Hagan to Westinghouse resulted in a partial termination of the Hagan Plan, and consequently gave full vesting to plaintiffs of their rights under the plan, although they had less than the 10 years' participation required for full vesting.

It is the position of defendants that the sale by Hagan of its controls division to Westinghouse resulted in the severance of the employment of all the controls division's personnel. These employes were paid that portion of the profit provided for under the Hagan Plan for employes with more than 5 and less than 10 years' participation. The unvested balance of each plaintiff's account was reallocated to the remaining participating employes in accordance with the express provisions of the Hagan Plan. It is the position of the defendants that the sale of a division was not one of the conditions that accelerated vesting under the eligibility provisions of the Hagan Plan.

The Hagan Plan makes no provision for partial termination because of the sale of a division. The plan enumerates in detail in clause 5 of the conditions under which the severance of employment before 10 years' participation will result in full vesting of the profit sharing benefits—death, total permanent disability, retirement, and employment with an agent of the company at the request of the company. In addition, clause 21 provides that termination of the profit sharing plan by the company will result in full vesting.

The plan is clear and unambiguous. These are the only conditions under which there is full vesting without 10 years' participation in the fund. The vesting provision is as follows:

"5. *VESTING:*

"(a) On the *death* of a participating employee before retirement date, there shall vest in his beneficiary the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4, and payments shall be made in accordance with Clause 22;

"(b) In the event of a participating employee becoming *totally and permanently disabled* before retirement date, there shall vest in him the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4, and payments shall be made in accordance with Clause 22. 'Total and permanent disability' shall be deemed to have occurred when two practicing members of the American Medical Association, who are not related by blood or marriage to the participating employee, shall certify in writing to the Advisory Committee that such participating employee is totally disabled and probably will remain in such condition for at least two years.

"(c) After a participating employee has attained the age of sixty years and has had thirty years continuous prior service, there shall, at his option, should he elect to *retire,* vest in him the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4, and payments shall be made in accordance with Clause 22.

"(c1) Should a participating employee *accept employment with an Agent of the Companies at the request of the Companies,* or any of them, there shall vest in him on the date of the severance of his employment with the Companies, the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4." (Italics supplied.)

Significantly, clause 5(d) specifically states that in event of *any severance of employment for any reason other than those enumerated,* there shall be vesting only for each full year of participation. The section reads as follows:

"(d) *In the event of a severance of employment for any reason other than in (a), (b), (c), or (c1)*, there shall vest in the participating employe such part of the credit as of the last day of the preceding year as determined in Clause 4 as follows:

"10% of such sum for each full year of service not exceeding ten after admission to the Plan by such participating employee, those entering initially to have their computation made from January 1, 1951. Payments under this subclause shall be made in accordance with Clause 22. The transfer of a participating employee from the employ of one Company to another shall not constitute a severance of employment." (Italics supplied.)

Clause 6, relating to forfeitures, specifically states that *upon severance of employment for any reason whatever except those enumerated*, forfeiture takes place as to unvested funds.

"6. *FORFEITURES: Upon severance of employment of any participating employee for any reason whatever, except as in Clause 5 (2), (b), and (c), the full amount to his credit shall be forfeited*, and become the property of the Trust except for that part he is entitled to take under Clause 5(d). The total amount of such forfeitures for each calendar year shall be allocated among the remaining participating employees in the same manner as the Trustee will allocate contributions under Clause 4(a) for such year. Should there be no contributions for such year, the allocations shall be made on the basis that the allocations would have been made had contributions been made." (Italics supplied.)

Patently, the severance of employment in the case at bar did not result from any of the enumerated conditions where full vesting was authorized. The termination of the employment of plaintiffs was not due to death, permanent disability, retirement, employment by an agent at the request of the company, or by rea-

son of the termination of the profit sharing plan by the company. The Hagan Plan is still in operation. It specifically states that in event of severance for any reason other than those enumerated, there shall be vesting only for each full year of participation. Moreover, clause 20 states that dismissal does not result in any additional rights:

"20. *DISMISSAL OF EMPLOYEE:* Participation in the Profit-Sharing Plan herein embodied shall not give any employee the right to be retained in the Companies' employ nor, upon dismissal, to have any right or interest in this Trust other than is herein provided."

Plaintiffs urge that the enumerated reasons for full vesting are voluntary and that their severance was involuntary. There is nothing voluntary, however, about death, permanent disability, or employment by an agent of the company at the company's request. Nor does dismissal, which is clearly involuntary, result in full vesting.

Under Clause 10(b) of the Hagan Plan, the advisory committee had express power to construe the plan:

"10(b) The Advisory Committee shall have complete control of the administration of the Profit-Sharing Plan herein embodied, with all powers necessary to enable it properly to carry out its duties in that respect. Not in limitation, but in amplification of the foregoing, such Committee shall have power to construe the said plan and to determine all questions that shall arise thereunder, and shall also have all powers elsewhere in this agreement conferred upon it. It shall decide all questions relating to the eligibility of employees to participate in the benefits of this Trust. All disbursements by the Trustee, except for the ordinary expenses of administration of this Profit-Sharing Trust, shall be made upon, and in accordance with, the written instructions of the Advisory Committee. The de-

cisions of the said Committee upon all matters within the scope of its authority shall be final."

The advisory committee decided that the accelerated vesting provisions of the Hagan Plan could not be construed so as to provide for full vesting rights to employes whose services were terminated because of the sale of the controls division. The advisory committee authorized the payment to each severed employe of an amount based upon each full year of participation in accordance with the terms of the Hagan Plan.

The advisory committee's position is consistent with the unambiguous language of the plan. A similar conclusion was reached by the advisory committee when the Pittsburgh chemical plant of Hagan was shut down in 1956. The employes' rights were not held to be enlarged because the plant was shut down and several dozen employes discharged. They received benefits based upon their years of participation. The unvested funds were forfeited and distributed among the remaining participants. The closing of a plant was not one of the enumerated conditions providing for full vesting.

While clause 10(b) states that the construction of the advisory committee is final, the chancellor is of the opinion that the decisions of the committee may be reviewed by the courts to determine whether they are arbitrary, constitute a manifest abuse of discretion, are fraudulent, or so grossly erroneous as to imply bad faith or a failure to exercise honest judgment. The court believes that the advisory committee's interpretation is consonant with the clear language of the plan and was an honest exercise of judgment.

Under the terms of the Hagan Plan, the company can make amendments. The advisory committee did consider recommending to the company an amendment to permit full vesting because of the sale of a division. The matter was fully surveyed at several

meetings, but the committee decided against making the recommendation. The company never adopted such amendment.

This court is urged, as a court in equity, to interpret the Hagan Plan as partially terminated by the sale of the controls division, so as to give full vesting to the 182 employes whose services were terminated by reason of the sale. In effect, the court is asked to rewrite the plan so as to add to the enumerated conditions for full vesting contained in clause 5 an additional category—the sale of a division.

The court has no such power. It cannot change the plan by strained interpretation or insert amendments rejected by the advisory committee and the company.

### FINDINGS OF FACT
[As Amended February 5, 1969]

1. The Hagan Corporation and its subsidiaries, in the course of a corporate reorganization, became Hagan Chemicals & Controls, Inc. Hagan Chemicals & Controls, Inc., sold the controls division in 1963, whereupon its corporate name was changed to Calgon Corporation.

2. Plaintiffs are 182 former employes of the Controls Division of Hagan Chemicals & Controls, Inc., who were participants in a profit sharing plan when the controls division was sold to Westinghouse.

3. The individual defendants constitute the advisory committee of the Hagan Corporation Profit-Sharing Plan and Trust (hereinafter referred to as the "Hagan Plan").

4. Pittsburgh National Bank, successor by various mergers, is the trustee of the Hagan Plan.

5. On December 13, 1951, the Hagan Corporation and its subsidiaries established a noncontributory, trusteed profit sharing plan known as the "Hagan Corporation Profit-Sharing Plan and Trust." Those in the

employ of Hagan at the time of the inception of the plan, who had five years continuous employment, became immediate participants. New employes were required to have five years of continuous employment with Hagan before they could participate in the plan. The employes did not contribute to the plan.

6. The plan provided for an annual contribution from the employer's consolidated net income into a trust fund, the contribution and net trust income being allocated to the individual account of each participating employe. Such tentative allocations became vested benefits only in accordance with the express provisions of the plan on severance of employment and termination of the trust. The plan provided that the unvested balance in a severed employe's account would be forfeited and reallocated among the accounts of the remaining participants.

7. The plan provided for an advisory committee, consisting of members of the corporation's board of directors, to administer the plan, with the power to construe the eligibility provision.

8. The company reserved the right to alter or terminate the plan in whole or in part, subject only to the restriction that any amount credited to a participant's account would not be affected thereby.

9. Amendments to the trust could be made only by the company, with written notice to the trustee.

10. Clause 5 of the profit sharing plan deals with vesting and provides as follows:

"5. *VESTING:*

"(a) On the death of a participating employee before retirement date, there shall vest in his beneficiary the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4. . . .

"(b) In the event of a participating employee becoming totally and permanently disabled before retire-

ment date, there shall vest in him the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4. . . .

"(c) After a participating employee has attained the age of sixty years and has had thirty years continuous prior service, there shall, at his option, should he elect to retire, vest in him the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4. . . .

"(c1) Should a participating employee accept employment with an Agent of the Companies at the request of the Companies or any of them, there shall vest in him on the date of the severance of his employment with the Companies, the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4.

"As of the last day of March of the year following, there shall also vest in him the pro rata part of his profit sharing for the year in which severance of employment occurs to the date of severance of employment. The preceding sentence shall not apply unless the period of employment in the year of severance exceeds three months.

*     *     *

"(d) In the event of a severance of employment for any reason other than in (a), (b), (c), or (c1), there shall vest in the participating employee such part of the credit as of the last day of the preceding year as determined in Clause 4 as follows:

"10% of such sum for each full year of service not exceeding ten after admission to the Plan by such participating employee, those entering initially to have their computation made from January 1, 1951. . . ."

11. Clause 6 of the profit sharing plan deals with forfeitures and provides as follows:

"6. *FORFEITURES:* Upon severance of employment of any participating employee for any reason whatever,

except as in Clause 5(a), (b), (c) and (c1), the full amount to his credit shall be forfeited, and become the property of the Trust except for that part he is entitled to take under Clause 5(d). The total amount of such forfeitures for each calendar year shall be allocated among the remaining participating employees in the same manner as the Trustee will allocate contributions under Clause 4(a) for such year. Should there be no contributions for such year, the allocations shall be made on the basis that the allocations would have been made had contributions been made."

12. Clause 16 of the profit sharing plan deals with the procedure for amending or terminating the trust and provides as follows:

"16. *AMENDMENT OF TRUST:* The Companies shall have the right at any time, by an instrument in writing duly executed and acknowledged and delivered to the Trustee, to modify, alter, amend, or terminate this agreement in whole or in part; provided, however, that the duties, powers and liability of the Trustee hereunder shall not be substantially increased without its written consent; and provided, further, that the amount which at the time of any such modification, alteration, amendment, or termination shall appear as a credit in the account of any employee participating in the Profit-Sharing Plan embodied herein, shall not be affected thereby; and provided, further, that no such amendment shall have the effect of revesting in the Companies, or any of them, any part of the principal or income of the Trust."

13. Clause 21 of the profit sharing plan deals with full vesting upon termination of the trust and provides as follows:

"21. *TERMINATION OF TRUST:* In the event that the Companies, under the powers herein mentioned, shall terminate the Trust, there shall vest in the participating employees the amounts to their credit, not-

withstanding anything hereinbefore written, plus their pro rata share of any gains and losses on the sale of the investments of the Trust, and payments shall be made in accordance with Clause 22."

14. The powers of the advisory committee are set forth in clause 10(b) of the profit sharing plan, which provides as follows:

"(b) The Advisory Committee shall have complete control of the administration of the Profit-Sharing Plan herein embodied, with all powers necessary to enable it properly to carry out its duties in that respect. Not in limitation, but in amplification of the foregoing, such Committee shall have power to construe the said plan and to determine all questions that shall arise thereunder, and shall also have all powers elsewhere in this agreement conferred upon it. It shall decide all questions relating to the eligibility of employees to participate in the benefits of this Trust. All disbursements by the Trustee, except for the ordinary expenses of administration of this Profit-Sharing Trust, shall be made upon, and in accordance with, the written instructions of the Advisory Committee. The decisions of the said Committee upon all matters within the scope of its authority shall be final."

15. Clause 20 of the profit sharing plan deals with dismissal of employes and provides as follows:

"20. *DISMISSAL OF EMPLOYEE:* Participation in the Profit-Sharing Plan herein embodied shall not give any employee the right to be retained in the Companies' employ nor, upon dismissal, to have any right or interest in this Trust other than is herein provided."

16. The Internal Revenue Code, section 401(a)(2), prohibits the return to the employer of previously allocated profit sharing contributions.

17. On April 30, 1963, plaintiffs in this action were participating employes in the Hagan Plan.

18. The Hagan Plan benefited the company by providing a means of attracting new employes, providing an incentive for improved employe performance, and reducing employe turnover.

19. Information about the Hagan Plan was disseminated to the employes by the company in its newspaper, and the employes annually received a statement of the funds credited to their accounts.

20. In February 1953, the company published a booklet describing the highlights of the Hagan Plan. This booklet was revised in September 1959, and again in April 1962. These booklets contained a similar explanation as to what an employe could expect to receive from the Hagan Plan in the event his employment was severed for any reason other than death, total disability, or retirement. A copy of the then current booklet is given to each new employe at the time of hire.

21. On April 11, 1963, Hagan Chemicals & Controls, Inc., entered into an agreement to sell the assets and business of its controls division and the right to use the name "Hagan" to Westinghouse Electric Corporation for 132,000 shares of Westinghouse stock. The closing date for this sale was April 30, 1963, and on this date Hagan Chemicals & Controls, Inc., changed its corporate name to "Calgon Corporation." This Westinghouse stock was disposed of by Calgon Corporation within 12 to 18 months after the sale of the controls division.

22. On April 15, 1963, the employes of the controls division were advised of the sale of the division to Westinghouse.

23. On April 30, 1963, the employment of all controls division employes was severed by Hagan Chemicals & Controls, Inc., and on the following day May 1, 1963, they voluntarily became employes of Westinghouse Electric Corporation.

616

24. After the transaction between the company and Westinghouse on April 30, 1963, all of the employes of the controls division had their same jobs, same supervisors, same separate quarters, same business, same contracts; only two personnel changes were made, both at management level.

25. The reason asserted by Hagan Chemicals & Controls, Inc., for the sale of its controls division was the continued losses in this division and the unwillingness of the company to make the substantial investment necessary to successfully meet the rising competition in the controls field.

26. At the time of the sale of the controls division, there were 639 participants in the Hagan Profit-Sharing Plan. Two hundred fifty-seven of these participants were controls division employes, 75 of whom had 10 or more years of service after admission to the plan, as of December 31, 1962, and their interests in the profits were fully vested under clause 5(d) of the Hagan Plan. The remaining 182 employes of the controls division had less than 10 years of service after admission to the plan, as of December 31, 1962, and their interests in the profits were only partially vested under clause 5(d).

27. On April 16, 1963, the advisory committee of the Hagan Plan held a meeting and determined that clause 5(d) of the plan, as written, did not permit full vesting for participating employes of the controls division with less than ten years of service after admission to the plan, as of December 31, 1962.

28. The advisory committee of the Hagan Plan twice considered recommending an amendment to the plan to provide for full vesting for this group of employes, but unanimously rejected the proposed recommendation. The company, which has the sole power to adopt amendments to the plan, never adopted any amendment involving the controls division.

29. By letter dated April 19, 1963, D. C. McKim, acting for the advisory committee, instructed the trustee to make distribution from the Hagan Plan to the controls division's participating employes in the amounts designated in his letter, which sums represented the vested portion of the severed participants' profit sharing accounts.

30. On April 19, 1963, each controls division employe was given a statement showing the amount he was to receive from the Hagan Plan and the manner in which this amount was computed.

31. On April 26, 1963, checks totaling $830,895.05 were issued by the trustee to the 257 controls division participating employes whose employment was to be severed as a result of the sale of the controls division to Westinghouse, in the respective amounts specified in Mr. McKim's letter of April 19, 1963, to the trustee. Plaintiffs received $250,508.45 of this sum.

32. A total of $157,359.27 was forfeited by the 182 controls division participating employes who were not fully vested under the terms of clause 5(d) of the profit sharing plan. This sum was reallocated among the 382 remaining participants in the profit sharing plan in accordance with clause 6 of the Hagan Plan.

33. The Hagan Plan was not terminated upon the sale of the controls division to Westinghouse and is in effect today. Calgon Corporation has continued to make annual contributions to the trustee in accordance with clause 3 of the Hagan Plan. In 1964, it issued a new revision of the booklet describing its profit sharing plan. As of November 30, 1966, there were 559 participants in the plan.

34. In 1956, when Hagan closed a chemical manufacturing plant in Pittsburgh and moved the operation to Rockwood, Michigan, the employment of 35 participants in the plan was severed by Hagan. These participating employes received only the vested portion of

the amounts standing to their credit in their respective accounts; the remainder was forfeited and reallocated among the remaining participants. The closing of the plant was not construed by the advisory committee as a basis for giving vested rights to the employes whose service was terminated.

## DISCUSSION

A noncontributory profit sharing plan is not a gratuity; it is a contract. There are mutual benefits accruing to both an employer and the employes from the stabilization of employment, deferred earnings and tax benefits which result from profit sharing plans. The courts have held that a profit sharing plan is a unilateral offer by the employer to the employe of an interest in the profit sharing fund, with acceptance evidenced by the employe's continued service: Siegel v. First Pennsylvania Banking and Trust Company, 201 F. Supp. 664, at 666-67 (E.D.Pa. 1961). Plaintiffs' claim for $157,359.27 must be grounded upon provisions of the profit sharing agreement, since they have no rights save by virtue of the agreement.

The Hagan Plan contains the usual features of plans of this type. Participation begins after five years' service, except as to those who were in the employ of the company when the plan was adopted. Full vesting takes place at the end of 10 years of participation or upon certain specified occurrences. The Hagan Plan provides that upon severance of employment for any reason except those specifically enumerated—death, total permanent disability, retirement, employment by an agent of the company at the company's request, or termination of the plan by the company—the unvested funds shall be forfeited and reallocated among the remaining participating employes.

Severance before 10 years' participation entitled the employes to receive 10 percent of the amounts to

their credit for each full year of participation. Plaintiffs, who had admittedly participated in the plan for less than the 10 years required for full vesting, were paid $250,508.45 for the years they had participated in the profit sharing plan. The unvested funds, amounting to $157,359.27, were forfeited by the advisory committee and reallocated to the remaining participants in the fund in accordance with the forfeiture provisions of the trust.

Plaintiffs' claim is based upon legal and equitable grounds. These grounds, as outlined in plaintiffs' brief, may fairly be summarized as follows:

1. The sale of a division was "an uncontemplated occurrence" which should excuse conditions precedent to complete vesting.

2. The forfeiture of unvested funds gives "the remaining participating employes a windfall they did not earn."

3. The Internal Revenue Code and regulations require the "termination of a large number of employes to be construed as a partial termination."

4. "The large scale disassociation of participants under a profit-sharing plan results in partial termination."

A change in the operation of a company, the discontinuance or sale of unprofitable divisions, or the acquisition of new companies, cannot be said to be "uncontemplated." Subsequent to the sale of the controls division, the Hagan Company acquired several new companies. These changes were the result of business decisions that could well have been anticipated even though the particular department to be dropped, or the specific companies to be acquired, were not known at the time of employment. What was known was that unless there was full participation for ten years there could not be full vesting, the employes be-

ing limited to payment under the profit sharing plan for each full year of participation. What was known was that the only provisions in the plan for accelerated vesting were specified—death, total permanent disability, retirement, employment by an agent of the company at the company's request, or the termination of the profit sharing plan by the company. The claim of the former employes in the case at bar is not based upon any of the enumerated conditions which authorize full vesting. Neither the vesting provision of the trust nor the provision for accelerated vesting under specifically enumerated conditions contains any language that covers termination of employment of a substantial number of employes because of the sale of a division.

Nor is there validity to the argument that by forfeiture the remaining employes will receive a windfall of money they did not earn. The record discloses that the controls division had not been profitable and that the employes of this division were receiving for some time money in the profit sharing plan which they had not earned. They were entitled to these funds because the profit sharing was determined on the basis of the entire operation of the company, and not on the performance of a specific division. Forfeiture always results in a windfall. The normal severance due to resignation of employes results in reallocation of funds to remaining partipants every year. Termination due to the sale of the controls division resulted in substantially higher forfeitures than normally occurred. However, authorizing full vesting to employes who had participated in the profit sharing for periods varying from 6 years to under 10 years, would give them a windfall they had not earned, one which the plan not only did not authorize but specifically required to be paid to the remaining participants.

The contention that under the provision of the Internal Revenue Code the severance of a large block of employes must be treated as a partial termination is not borne out. Neither the code nor the regulations contain such a requirement. Plaintiffs rely on section 1.401-6-(b)(2) of the Internal Revenue Regulations, which provides as follows:

"For purposes of this section, the term 'termination' includes both a partial termination and a complete termination of a plan. *Whether or not a partial termination of a qualified plan occurs when a group of employees* who have been covered by the plan are subsequently excluded from such coverage *either by reason of an amendment to the plan, or by reason of being discharged by the employer, will be determined on the basis of all the facts and circumstances.*" (Italics supplied.)

Significantly, this very section states that the question of whether or not a partial termination has occurred "will be determined on the basis of all the facts and circumstances." A pertinent fact to be considered is that the plan specifically states that *severance of employment for any reason other than those enumerated* will give the participating employe 10 percent for each full year of service. Another relevant fact to be taken into consideration is that a proposed amendment authorizing full vesting for the employes of the controls division on the basis of partial termination was taken under advisement by the advisory committee on two occasions and rejected. There is no conflict between the Internal Revenue Regulations and the conclusion reached in the instant case.

All profit sharing plans required approval by the Internal Revenue Service. According to the record, the Hagan Plan was approved. It has remained continuously in operation since the controls division was sold. Seemingly, the validity of the plan has not been af-

fected by the sale of the controls division in 1963. If the failure to give vested rights to the former employes of the controls division was in violation of the Internal Revenue Code, plaintiffs could have obtained a ruling to that effect from the Internal Revenue Service.

The argument that severance of a large number of employes results in a partial termination regardless of whether such a partial termination is authorized under the profit sharing agreement, is not persuasive. It ignores completely the legal effect of the express and exclusive conditions for vesting and accelerated vesting contained in the Hagan Plan and the requirement that amendments to the plan and termination in whole or in part must be made by the company in writing. There is no doubt that a provision in a profit sharing plan allowing full vesting in the event of the severance of a large number of participants would be valid. An amendment to the plan, so as to include among the employes entitled to accelerated vesting those whose jobs were terminated by the sale of a division, could have been adopted. The difficulty in the case at bar is that the original plan makes no provision whatever for accelerated vesting because of the sale of a division, and a recommendation for the adoption of an amendment to the plan covering this contingency was specifically rejected by the advisory committee and never adopted by the company.

While the Hagan Plan contains a provision in clause 16 that the company "shall have the right at any time, by an instrument in writing duly executed and acknowledged and delivered to the Trustee, to modify, alter, amend, or terminate this agreement in whole or in part," no action was taken by the company to amend the profit sharing agreement or terminate it in whole or in part. Its failure to do so does not give a court in equity the power to construe the plan as if such an amendment had been made, ignoring the specific re-

jection of the amendment by the advisory committee several weeks before the severance of the employment of the personnel of the controls division by the sale to Westinghouse.

When the Hagan Company wanted to amend the eligibility provisions to provide accelerated vesting for employes who were asked to accept employment with an agent of the company, it knew how to accomplish the desired result. It followed the procedure outlined in the plan. The company adopted an amendment (c1), which reads:

"(c1) Should a participating employee accept employment with an Agent of the Companies at the request of the Companies or any of them, there shall vest in him on the date of the severance of his employment with the Companies, the amount to such participating employee's credit as of the last day of the preceding year as determined in Clause 4."

The advisory committee did not attempt to give these employes full vesting at termination by construing the plan so as to include them. An amendment to the Hagan Plan was deemed necessary and was adopted to give them full vesting.

Significantly, in 1956, when Hagan decided to discontinue a chemical manufacturing plant in Pittsburgh, the group of employes affected were not given accelerated vesting under the terms of the plan, nor was an amendment adopted by the company to treat the closing of a plant and the termination of the employment of these employes as a partial termination. The group of severed employes on that occasion was treated in the same fashion as the controls division employes were treated in the instant case. They were paid only for the years of full vesting, and the unvested funds were forfeited and reallocated among the remaining participants in accordance with the provisions of the Hagan Plan.

In the absence of any amendment providing for partial termination, Clause 21 of the Hagan Plan is the only section that relates to termination. Clause 21 reads as follows:

"21. TERMINATION OF TRUST: In the event that the Companies, under the powers herein mentioned, shall terminate the Trust, there shall vest in the participating employees the amounts to their credit, notwithstanding anything hereinbefore written, plus their pro rata share of any gains and losses on the sale of the investments of the Trust, and payments shall be made in accordance with Clause 22."

There never was a termination of the Hagan profit sharing plan. In fact, the plan has been in continuous operation and is still in effect in the Calgon Corporation, successor to the Hagan Corporation.

No legal authority has been cited by plaintiffs to support their claim that the termination of a large section of the company's operation through sale or discontinuance gives the severed employes any rights not provided in the plan. There have been numerous cases where the courts of this and other jurisdictions have held that the discontinuance of a large block of employes gave no vested rights to those employes whose participation in the plan was less than required for full vesting. While these cases are not completely analogous on their facts, they do involve large numbers of employes whose employment was involuntarily severed by reason of the closing of plants, sale of plants, or discontinuance of certain of the employer's activities, with consequent loss of the right to pensions and profit sharing. The results in these cases are far harsher than in the case at bar where the employes did receive payment for every year of participation.

The case of Fernekes v. CMP Industries, Inc., 13 N.Y. 2d 217, 246 N. Y. S. 2d 201 (1963), involved a company which had two divisions when it estab-

lished a retirement and profit sharing plan. Subsequently, the company sold one of the two divisions and terminated the employment of all the members of that division who went to work for the purchaser. The court of appeals held that the sale of a division did not constitute a termination of the plan and that plaintiffs had no enforceable legal interest in the assets of the plan.

The Fernekes case also involved a profit sharing plan which the court enforced according to its terms, despite the sale of a division. We do not see any merit to the distinction sought to be made between the instant case, and the Fernekes case on the ground that the profit sharing plan in Fernekes did not contain a provision for termination in part as well as in whole. The fact is that the power to amend the plan and to terminate it in part was never exercised in the case at bar, and until this was done in writing by the company and transmitted to the advisory committee, the plan remained one that required termination of the entire profit sharing plan by the company in order to achieve full vesting. In the Fernekes case, the court emphasized that the terms of the particular agreement are controlling in its interpretation and that the court could not write into the plan provisions not contained therein.

In Schneider v. McKesson & Robbins, Inc., 254 F. 2d 827 (2d Cir. 1958), the company had closed its Newark drug division and terminated the employment of the people who worked there and who were participants in a pension plan. The court held that plaintiffs had no interest in the fund because of the closing of the Newark division.

"The appellants urge upon us certain equitable considerations, as, for example, their reliance upon the plan, and contend that a court of equity should fashion a remedy to prevent the injustice which it is

claimed will result if they are denied participation in the fund. But, as the court below stated, there is no justification for a court 'to twist the Plan into something it clearly is not.' Whatever reliance the appellants may have placed upon their expectation of future pension rights, the terms of the plan clearly indicate that all interest in the pension fund ceases when the employment relationship is severed."

In Bailey v. Rockwell Spring and Axle Company, 175 N. Y. S. 2d 104, 13 Misc. 2d 29 (1958), it was argued that the sale of a division constituted a liquidation under the terms of the plan, and that they were entitled to the benefit of the annuities purchased for their account. The court refused to hold that the sale of a division constituted a termination of the retirement plan as to the employes of that division. There were 188 employes out of 1,740 who were affected by the sale of the division.

In George v. Haber, 343 Mich. 218, 72 N. W. 2d 121 (1955), 1,100 out of 1,550 were affected by the curtailment of operations. It was urged that this constituted a termination of the trust. The court held otherwise, and stated that it would not rewrite the agreement. The Kaiser-Frazer Corporation had disposed of its production facilities at Willow Run, Michigan, its principal place of business. Operation at other plants in the State of Michigan was curtailed. The employment of 95 percent of 11,000 employes of the Kaiser-Frazer Corporation was terminated. The employes brought suit to terminate the pension trust fund on the ground that the drastic curtailment of operations constituted a termination of the trust. The court held that since 450 employes were retained, the pension plan was not terminated. The termination of the employment of a majority of the employes was held not to constitute a termination of the

pension plan. The court refused to rewrite the agreement.

In Reilly v. Walker Brothers, 425 Pa. 1 (1967) over 100 employes were affected by the company's decision to curtail some of its activities, with a view towards eventual termination. The court held that the employes were only entitled to pensions if they satisfied the requirement for 10 years of continuous service as defined in the plan. The plan provides that continuous service is interrupted if a period of 12 months elapses since the employe last worked, unless incapacitated. The court held that failure to comply with either of these conditions prevented the employes from benefiting from the pension plan. The appellate court refused to recognize equitable considerations advanced by the chancellor to enable the terminated employes, who did not meet the requirements for eligibility established by the plan, to receive pensions. The provisions of the plan were held to be controlling.

The Pennsylvania Supreme Court in the Reilly case was unequivocal in its restriction of the power of a chancellor to rewrite a plan in accordance with the chancellor's own ideas of what would be fair and equitable. The court held that the chancellor had no right to ignore the requirements in the pension plan, that it must be enforced in accordance with its terms. The Supreme Court held that courts have no authority to redraft the agreement. The court stated, at pp. 12 and 13:

". . . The chancellor does not have the authority to rewrite or amend a plan or make changes, in accordance with his own ideas, as to what is fair and equitable.

"There being no inequity or illegality in the terms of the pension agreement, it should be enforced in ac-

cordance with its terms and courts have no authority to redraft the agreement to include people not entitled to benefit, to the detriment of those who are entitled to participate."

While some of these cases involve pension plans rather than profit sharing plans, the fundamental principle that the requirements of the contract are controlling is applicable to both types of plans. This court feels bound by the principles established in Reilly v. Walker Brothers, supra.

Defendants filed preliminary objections claiming that the remaining participating employes of Calgon, Inc., are the real parties in interest and the court lacks jurisdiction for failure of plaintiffs to join indispensable parties, and asking that the complaint be dismissed. The preliminary objections were argued before Brosky, J., Motions Judge, and ordered dismissed for the reasons that the presently participating employes have no vested interest in the trust fund and that defendant trustee adequately represents their interests in the fund.

Defendants have renewed their contention that this court lacks jurisdiction for failure of plaintiffs to join the remaining participating employes at Calgon, Inc., as indispensable parties. This issue was thoroughly explored before the motions judge, and the definitive ruling made at that time is dispositive of the matter. While the chancellor might have reached a different conclusion on this issue, the matter is of no significance in light of our findings in this case.

For the reasons stated, the complaint will be dismissed.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter.

2. The court has no authority to rewrite or amend the Hagan Plan to provide full vesting for those controls division employes entitled only to partial vesting under the terms of the plan.

3. While under clause 10(b) of the Hagan Plan the advisory committee has control of the administration of the plan, including the power to construe the plan and to determine all questions arising thereunder, the advisory committee's determination is not final and is subject to judicial review.

4. The advisory committee acted within its authority in deciding that under the express terms of the Hagan Plan plaintiffs were not entitled to full vesting of the amounts standing to their credit in their respective accounts. They had participated in the fund for less than the ten years required for full vesting, the termination of their employment was not due to any of the enumerated contingencies in clause 5, where accelerated vesting was authorized, and the plan was not terminated but continued in effect.

5. Under the express provisions of the plan, partial termination with full vesting could be secured only by an amendment to the profit sharing plan, adopted by the company in writing.

6. Under the well established principle of expressio unius est exclusio alterius, the eligibility provisions for accelerated vesting enumerated in clause 5(d) can only be augmented by an amendment authorized by the company in writing providing full vesting for groups of employes whose services were terminated by virtue of the sale of a division.

7. The termination of the employment of a group of employes because of the sale of a division did not automatically result in partial termination and full vesting.

8. Where there has been a rejection of an amendment to give full vesting to the controls division employes by

the advisory committee, and the company never adopted such an amendment in accordance with the authority contained in the plan, the court cannot revise the plan by giving full vesting to these employes despite the express contrary intention of the company and the provisions of the profit sharing plan.

9. The termination of the plan could only be accomplished through action of the company in writing, in the manner prescribed in clause 21.

10. Upon the severance of their employment by Hagan Chemicals & Controls, Inc., on April 30, 1963, the controls division employes ceased to be participants in the Hagan Plan.

11. Under clause 20 of the Hagan Plan, the plaintiffs, after the severance of their employment on April 30, 1963, retained no right, title, or interest in the trust.

12. The Hagan Plan was not terminated by the sale of the controls division to Westinghouse Electric Corporation.

13. The profit sharing plan has been in continuous effect and has not been terminated by Calgon, Inc., successor to the Hagan Corporation.

14. The provisions of clause 21 of the Hagan Plan, which deal with full termination of the trust by the company, do not cover a partial termination which can only be achieved by amendments in accordance with clause 16.

15. Upon the severance of their employment, plaintiffs were entitled to receive, and did receive, that portion of the amount standing to their credit in their respective accounts which had vested under and pursuant to clause 5(d) of the plan, amounting to $250,508.45.

16. The distributions made to plaintiffs by the trustee, at the instruction of the advisory committee, were in accordance with clause 5(d) of the Hagan Plan

and were the amounts they were entitled to receive under the express terms of the plan.

17. Under the terms of clause 6 of the Hagan Plan, the unvested balances standing to plaintiffs' credit in their respective accounts at the time of the termination of their employment are forfeited and become the property of the trust, to be reallocated among the remaining participants in the plan.

18. The Internal Revenue Code contains no provision for a mandatory partial termination in the event of the severance of a large group of employes by reason of the sale of a division.

19. The Internal Revenue Code regulations state that the effect of the severance of a large group of employes is determined by the provisions of the plan itself and other relevant facts and circumstances.

20. The unambiguous valid provisions of a pension trust cannot be altered by judicial interpretation so as to substitute a different plan of eligibility for full vesting and give rights not conferred by the plan or by amendments to the plan.

21. The court is bound by the express language of the plan and cannot rewrite the plan so as to confer special benefits not covered by the plan.

22. A court in equity has no power to amend or revise a profit sharing plan.

## DECREE NISI

And now, August 4, 1967, it is ordered and decreed that the relief prayed for by plaintiffs is hereby refused and the complaint is dismissed.